**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JAMES WINSTEAD, *et al.,*

      Plaintiffs,

      v.

THE DISTRICT OF COLUMBIA, *et al.*,

      Defendants.

Civ. A. No. 04-887 (JMF)

**CONCLUSIONS OF LAW**

      This case is before me for all purposes including trial.  A bench trial was held on July 26, 27, and 28, 2010.  Below are my conclusions of law.  My findings of fact are made in a separate document.

**INTRODUCTION**

      Plaintiffs are eleven current or former District of Columbia employees and the estates of two former District of Columbia employees who have made claims for disability compensation pursuant to the District of Columbia Comprehensive Merit Personnel System Act ("CMPA").[1] Defendants are 1) the District of Columbia, 2) Mayor Vincent C. Gray,[2] and 3) James Jacobs, Director of the Office of Risk Management.[3]  Both Gray and Jacobs are sued in their official capacities.

---

[1] By minute order dated May 21, 2007, the estates of two individual plaintiffs were substituted as plaintiffs.
[2] Gray became Mayor in January of 2011, and therefore replaced former Mayor Anthony Williams as a named defendant.  See http://mayor.dc.gov/DC/Mayor/About+the+Mayor/Mayor+Biography/Vincent+C.+Gray (last visited March 29, 2011).
[3] Defendant Computer Literacy World/Creative Disability Management was terminated as a defendant on October 29, 2005.  See Stipulation of Dismissal Without Prejudice [#20].

## CONCLUSIONS OF LAW

A.    Plaintiffs' § 1983 Claim

The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty or property without due process of law. U.S. Const. amend. V.  Section 1 of the Civil Rights Act, codified at 42 U.S.C. § 1983[4] provides a cause of action for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  In other words, Section 1983 provides an individual with a cause of action based on a claim that his Fifth Amendment due process rights were violated.

In order for a person to claim a Fifth Amendment property interest in disability compensation, he must have a "legitimate claim of entitlement to it." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  Additionally, when suing under Section 1983, a person must prove that it was the municipality's policy or custom that caused the violation. Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978).

The Supreme Court recently stated:

> A municipality or other local government may be liable under this section if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subject" to such deprivation . . . But, under § 1983, local governments are responsible only for "their *own* illegal acts." . . . They are not vicariously liable under § 1983 for their employees' actions . . .
>
> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury . . . Official municipal policy includes

---

[4] All references to the United States Code and other statutes are to the electronic versions in Westlaw or Lexis.

the decisions of a government's lawmakers, the acts of its
policymaking officials, and practices so persistent and widespread
as to practically have the force of law.

Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011) (internal quotations and citations omitted)

(emphasis in original).

Inaction may constitute the adoption of a municipal policy when the failure to prevent the

violation of constitutional rights is premised on proof of the deliberate indifference to the

violation of those rights. Daskalea v. District of Columbia, 227 F.3d 433, 441 (D.C. Cir. 2000)

(quoting City of Canton v. Harris, 489 U.S. 378, 388-89 & n.7 (1989) ("[A] city's inaction,

including its failure to train or supervise its employees adequately, constitutes a 'policy or

custom' under Monell when it can be said that the failure amounts to 'deliberate indifference'

towards the constitutional rights of persons in its domain.")).

Recently, the Supreme Court emphasized how demanding this "indifference standard" is,

stating:  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." Connick, 131 S.Ct.

at 1360 (internal quotation omitted).  Therefore, "[i]nadvertent errors, honest mistakes, agency

confusion, even negligence in the performance of official duties, do not warrant redress under

this statute." Silverman v. Barry, 845 F.2d 1072, 1080 (D.C. Cir. 1988).  Accord Jordan v. Fox,

Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1277 (3d Cir. 1994) (noting that "a negligent

deprivation of due process will not sustain a § 1983 claim").  In order to prove that a

municipality acted with deliberate indifference, a plaintiff must prove that "the municipality

knew or should have known of the risk of constitutional violations, an objective standard." Baker

v. District of Columbia, 326 F.3d 1302, 1307 (D.C. Cir. 2003) (citing Farmer v. Brennan, 511

U.S. 825, 841 (1994)).  In other words, a municipality's acts "are discretionary to the point

3

before they become a deprivation of due process." Id. (internal citation omitted).

In the case at bar, there is no dispute that the disability benefits plaintiffs seek under the CMPA are protected property interests.  See Matthews v. Dist. of Columbia, 675 F. Supp. 2d 180, 186 (D.D.C. 2009); Fonville v. Dist. of Columbia, 448 F. Supp. 2d 21, 26 (D.D.C. 2006).  It is further undisputed that an unreasonable delay in the state's administrative processing of plaintiffs' claims may constitute an action cognizable under 42 U.S. C. § 1983. Kraebel v. N.Y. City Dep't of Hous. Pres. and Dev., 959 F.2d 395, 405 (2d Cir.) ("due process requires that eligibility for a variety of benefits be processed within a reasonable time") cert. denied, 506 U.S. 917 (1992); Schroeder v. Chicago, 927 F.2d 957, 960 (7th Cir. 1991) ("The cases on unreasonable delay are best understood as holding that implicit in the conferral of an entitlement is a further entitlement, to receive the entitlement within a reasonable time."); Kelly v. R.R. Ret. Bd., 625 F.2d 486, 489 (3d Cir. 1980) (delay in processing of disability payments can violate due process); Machado v. Leavitt, 542 F. Supp. 2d 185, 194 (D. Mass. 2008) (Sufficiently egregious delay in process entitlement may constitute a remediable constitutional violation, even if the relevant statutory framework does not specify a time for agency action).  See Matthews v. Eldridge, 424 U.S. 319, 330 (1976) (interest of claimant in prompt resolution of eligibility permitted him to bypass the full exhaustion route).

To that end, the Court previously "permitted the parties discovery to explore the due process factors pertaining to delay in the administrative process of adjudicating claims, as defined by the Second Circuit"[5]:

> Keeping in mind these two unusual aspects of Kraebel's due process claim, the district court on remand bearing in mind the deference appropriately accorded by courts to executive agencies regarding practicalities encountered by those agencies in administering legislative programs, cf. Eldridge, 424 U.S. at 347-

---

[5] Memorandum Order [#155] at 2.

> 48, 96 S.Ct. at 908-09, should engage in a factual inquiry to
> determine whether the burdens and delays imposed by the city
> were reasonable.  It may consider a variety of additional factors in
> making this determination: the procedures actually used by the city
> to determine whether a landlord is entitled to the claimed excess
> SCRIE payments, the factors the city considers, the level of
> difficulty in making the determination, the amount of work
> required, the amount of decision-making discretion given to the
> employees, the need for and availability of administrative appellate
> review, the necessity for the paperwork and supporting
> documentation required, the amount of time required to process
> similar claims, and any other factors that may bear on whether
> "due process" is provided.  If, given the steps reasonably necessary
> to restore to Kraebel the rents kept from her by this program, the
> court finds that the city has taken an unduly long time to process
> her applications, the court should not hesitate to award damages,
> which may include interest, calculated at a market rate, from the
> time that the delay became unreasonable.

Kraebel, 959 F.2d at 406.  Accord Metsopulos v. Mascali, No. 86-CV-1826, 1986 WL 15343, at

*12 (D.N.J. Dec. 29, 1986) (following Kraebel in defining the nature of the factual inquiry to be

conducted).  Ultimately, however, the Court was forced to reject "the discovery plaintiffs

attempted on the grounds that it was not directed to the remaining issues as [the Court] had

defined them." [#155] at 3.

1.   Analysis

The delay, about which plaintiffs complain of was great, in some cases lasting up to 8

years.  In no case, however, did plaintiffs provide any proof that the District knew or should have

known of the risk of constitutional violations.  That proof could, if plaintiffs had conducted the

discovery permitted by the Court, have taken various forms.  For example, plaintiffs could have

addressed the following aspects of the District's handling of plaintiffs' claims, whether it be the

review of a request for benefits or the review of a request for reconsideration of a previous

decision:  1)  the difficulty of the task itself, 2) the amount of discretion given the employee

performing the task, 3) the extent to which the employee was permitted to request additional

information, whether from the claimant or from another agency/office within the District of Columbia government, 4) the amount of time required to process similar requests, 5) the size of the employee's workload, 6) the size of the employee's staff, 7) the training and supervision given the employee, 8) the extent to which the District was aware of complaints similar to plaintiffs.

Plaintiffs could also have tried to establish by a valid statistical sampling or otherwise that the delays they encountered were typical of the delays encountered by similar applicants to the point that a reasonable person would have to conclude that the District must or should have known of them and did nothing and was therefore deliberately indifferent to a highly prevalent practice.

Because plaintiffs failed to explore any of those or other factors suggested by the <u>Kraebel</u> court, or the prevalence of the delay about which some of them may justifiably complain, plaintiffs' argument is solely that the period of time between the request for action and that action took too long, thereby violating plaintiffs' constitutional rights.  That is certainly not the law, for it would render the District liable automatically upon a showing of delay even though (a) the delay was justified by countervailing factors and (b) occurred in isolated instances. That, in turn, would be doing what cannot be done, subjecting a municipality to liability upon a showing of at most negligent behavior by a few of its employees that could not possibly have given the District notice of a prevalent violation of constitutional rights which the District disregarded. <u>See</u> <u>Brooks v. Celeste</u>, 39 F.3d 125, 129 (6th Cir. 1994) (repeated acts of negligence do not in themselves establish deliberate indifference: "Lack of objective reasonableness, i.e., a failure to act as a reasonable person would have acted, does not by itself equal deliberate indifference.")

As will be shown below, and as detailed in the accompanying Findings of Fact, plaintiffs' cases fail.  Some of the plaintiffs did not, in fact, encounter a delay which could possibly be described as unreasonable, even without consideration of any countervailing factors.  Indeed, some plaintiffs fail to even show an entitlement to anything more than what they promptly received.  Finally, while some plaintiffs did encounter lengthy delays, they advanced no proof whatsoever that the delays encountered were not justified or that the delays were so prevalent that there was in effect a municipal policy and practice of delaying action unconscionably—the result of the District's deliberate indifference to an obvious reality that unreasonable delays in processing petitions for rehearing was standard behavior.

     a.     <u>Tara Rogers</u>

According to Rogers, she suffered an unreasonable delay of either approximately 2 years and 2 months or approximately 3 years, depending upon when the Court determines is the appropriate start of the relevant claim period.  <u>Plaintiffs' Proposed Findings of Fact and Conclusions of Law</u> [#156] at 44.  With respect to the alleged 2 years and 2 months delay, Rogers cites the time between her April 9, 2004, request for reconsideration of the D.C. Disability Compensation Program's ("the DCP") <u>Compensation Determination by Examiner</u> reducing her benefits and the ORM's June 16, 2006, <u>Final Decision on Reconsideration</u>. <u>Id.</u> at 43-44.  With respect to the alleged 3 year delay, Rogers cites the time between her September 15, 2003 claim for permanent partial disability and the ORM's June 16, 2006 final decision.[6] <u>Id.</u>

---

[6] Although Rogers was injured on three occasions (January 1, 1998, April 27, 1998, and February 4, 2002), as noted above, the various documents submitted in support of Rogers' claim are not clear as to which date of injury is being referenced.  The cover letter to Rogers' September 15, 2003 correspondence references her February 4, 2002 injury but the report she attaches references her January 1, 1998 injury.  The Court therefore, will consider Rogers' request for September 15, 2003 reconsideration as one referencing her January 1, 1998 injury.

On April 2, 2004, the DCP issued a compensation determination regarding Rogers' January 1, 1998 injury. PEX 225 at 3-4.  According to the determination, Rogers was found to have a 27% permanent impairment on her right upper extremity and was awarded bi-weekly permanent partial disability payments of $544.66 until the total value of the award, $22,941.08, was paid. Id. at 3.  On April 9, 2004, Rogers sent DCP a letter 1) requesting reconsideration of the April 2, 2004 decision, 2) indicating that she did not wish to accept the permanent partial disability benefits, and 3) indicating that she wished to remain on temporary total disability. PEX 225 at 1.  On April 12, 2004, Rogers sent the DCP a second letter reiterating the requests in her April 9, 2004 letter and indicating further that she wanted a lump sum payment of accrued permanent partial disability benefits. PEX 226 at 1-2.  On July 23, 2004, the D.C. Office of Personnel ("OP") sent Rogers a letter asking for documentation of her current medical status and asking also if she intended to return to her position. PEX 228 at 2.  Two years later, on June 9, 2006, Rogers received a Notice of Termination indicating that her benefits had been overpaid. PEX 229.  Finally, on June 16, 2006, Rogers received a Final Decision on Reconsideration from the DCP upholding the previous determination as to Rogers' disability. PEX 230.

In the DCP's June 16, 2006 decision, it noted that prior to Rogers' April 9 and April 12, 2004 letters, in which she indicated that she did not wish to receive permanent partial disability payments, she had, on September 15, 2003, indicated by letter that she did wish to receive those benefits.  The DCP also provided a summary of the medical opinions upon which it relied and highlighted the disparity between the determinations of the treating physicians and the evaluating physicians.  Ultimately, the DCP upheld its earlier determination that Rogers had a 27% permanent impairment.

From this record, the Court cannot conclude that the delay between either Rogers' April 9, 2004, request for reconsideration or her September 15, 2003 claim for permanent partial disability and the ORM's June 16, 2006 final decision violated her due process rights.  First, it appears that during that period, Rogers changed her position with regard to receiving permanent partial disability benefits. PEX 230 at 2.  Initially, she indicated that she did wish to receive them but then later told the DCP that she did not.  Id.  That change in position clearly caused some confusion for the DCP, as explained in its June 16, 2006 decision:

> We have reviewed correspondence from your legal counsel dated April 12, 2004 requesting that we reconsider the determination of your permanent partial disability (PPD) benefits.  Your counsel Mr. Williams states that you do not wish PPD benefits at this time and that DCCP is not authorized to force acceptance of these benefits.  In a prior correspondence from Mr. Williams dated September 15, 2003 he makes request for PPD benefits by stating "Kindly accept this correspondence and enclosures as Claimant's formal request for an award pursuant to the schedule".  *We are unclear as to Mr. Williams's contradiction of your wishes in regard to PPD benefits.*

Id. (emphasis added).

Second, it is further clear from the DCP's June 16, 2006 decision that a review of Rogers' medical records was conducted, as evidenced by the DCP's citation to 1) Dr. Saltzman's 10/16/03 Independent Medical Examination ("IME"), 2) Dr. Barthon's 12/1/03 IME, 3) Dr. Jackson's evaluation, 4) Dr. Gunther's 12/23/02 report, 5) a 1/23/02 functional capacity evaluation, and 6) Rogers' participation in vocational rehabilitation services through Rehabilitation Perspectives Inc., Services. Id.

In light of the confusion surrounding Rogers' request for benefits, the time needed for the DCP to review Rogers' medical records, and the lack of any additional evidence, the Court cannot arbitrarily conclude that the period of delay Rogers complains of was unreasonable.

Thus, her claim fails fundamentally because she has not even shown an unreasonable delay, let alone one that was not justified by countervailing factors.

        b.    Patricia Hayden

According to Hayden, she suffered an unreasonable delay of approximately 3 years and 2 months, citing the time between her February 20, 2004, request for reconsideration and the D.C. Office of Risk Management's ("ORM") April 24, 2007, Final Decision on Reconsideration. [#156] at 40-41.[7]

On January 23, 2004, Hayden received $33,203.88 in total temporary disability compensation benefits for the period from September 1, 2000 to September 24, 2002. PEX 80 at 2; DEX 3 at 2.  On February 3, 2004, Hayden received a letter from the DCP explaining the way in which they calculated the $33,203.88 amount. PEX 73 at 1.  That letter also indicated that any future adjustments to the payment of benefits had to await further investigation of Hayden's other sources of income. Id. at 1-2.  In response, Hayden sent the DCP a letter which both provided additional information and also sought clarification of the DCP's calculations. PEX 74. Finally, on April 24, 2007, the ORM determined that Hayden was due an additional $79,951.27 in total temporary disability compensation for the period in question. PEX 80 at 2; DEX 3 at 2.

From this record, the Court cannot conclude that the delay between Hayden's February 20, 2004, request for reconsideration and the ORM's April 24, 2007, final decision violated her due process rights.  Without her showing that the delay she encountered was unjustified by factors that may have delayed the adjudication of her claim, the Court cannot conclude that the period of delay Hayden complains of was so unreasonable as to have effected in itself a denial of her constitutionally guaranteed due process rights.

---

[7] Although the April 24, 2007 decision references her November 30, 2005 injury in its caption, the body of the decision discusses her February 9, 1996 injury and thus relates to her February 20, 2004 request.

c.      George Morgan

According to Morgan, he suffered an unreasonable delay of approximately 7 years, citing the time between his November 14, 2000, request for reconsideration and the ORM's August 3, 2007, Final Decision on Reconsideration.[8] [#156] at 42.

On October 17, 2000, the DCP issued a compensation adjustment reducing Morgan's benefits as a result of the medical examiner's determination that Morgan was capable of returning to light duty work. DEX 18.  On November 14, 2000, Morgan sent the Department of Public Works two letters expressing his dissatisfaction with the adjustment. PEX 154 at 1-2.  On December 12, 2000, Morgan sent the DCP another request for reconsideration. PEX 155.  On January 3, 2001, Morgan requested an adjustment of his lost wage-earning capacity based on a change of circumstances—that his medical condition had worsened since the DCP's October 17, 2000 Notice of Determination ("NOD"). PEX 156.  On March 19, 2004, Morgan filed a claim for workers' compensation seeking an adjustment to his workers' compensation benefits. PEX 159.  In that letter, Morgan specifically indicated that he was no longer requesting reconsideration of the October 17, 2001 NOD. Id. at 1.  On August 3, 2007, Morgan received a Final Decision on Reconsideration from the DCP. PEX 161.

Although 7 years is not an insignificant period of time, without any additional evidence, the Court cannot arbitrarily conclude from this record that the delay between Morgan's November 14, 2000, request for reconsideration and the ORM's August 3, 2007, final decision was so prevalent and customary in the processing of his and similar claims that it constituted a municipal policy or custom or that such delay was so common that the District was deliberately indifferent to the obvious and known violation of the applicants' constitutional rights.

---

[8] The Court's analysis is based on a review of Morgan's claim for compensation for his May 10, 1983 injury. DEX 18.

11

      d.    <u>Denise Downing</u>

According to Downing, she suffered an unreasonable delay of 8 years, citing the time between her December 11, 2000, request for reconsideration and the DCP's October 9, 2008, payment of benefits. [#156] at 42-43.[9]

On August 31, 2000, Downing received a <u>Final Compensation Order</u> from the D.C. Department of Employment Services ("DOES"). PEX 162 at 1.  On December 11, 2000, January 4, 2001, and March 28, 2001, Downing requested an accounting of the benefits from the <u>Final Compensation Order</u>. PEX 164 at 1; PEX 166 at 1; PEX 167 at 1.  On June 12, 2001, Downing formally requested benefits and again requested an accounting of the previous determination. PEX 169.  On December 12, 2002, Downing requested a formal hearing from the Office of Hearings and Adjudication ("OHA") and on December 20, 2002, a pre-hearing conference was set for January 24, 2003. PEX 170 at 1; PEX 21 at 1-2.  On October 9, 2008, Downing received a check from the DCP for $34,799.36. DEX 42.

Although there is no explanation in the record as to what occurred during those 8 years, without any additional evidence, again the Court cannot arbitrarily conclude that the delay Downing complains of was so prevalent and customary in the processing of hers and similar claims that it constituted  a municipal policy or custom or that such delay was so common that the District was deliberately indifferent to the obvious and known violation of the applicants' constitutional rights.

      e.    <u>Juanita Irving</u>

The exact nature of Irving's argument is unclear.  It appears as though Irving is claiming that she suffered an unreasonable delay between the time of her September 25, 2001 request for

---

[9] The Court's analysis is based on a review of Downing's claim for compensation for her October 12, 1992 injury. PEX 164 at 1.

reconsideration of the DCP's August 28, 2001 <u>Notice of Determination by Examiner</u>, which suspended her compensation payments, and the evidentiary hearing that was held on July 22, 2009. [#156] at 42; PEX 139.

From this record, the Court cannot conclude that Irving's due process rights were violated.  On December 1, 2003, the DCP issued a <u>Reconsideration Final Order</u> reversing the August 28, 2001 suspension of payments. DEX 15.  Several days later, on December 8, 2003, Irving withdrew her application for review, citing "a resolution of contested issues." PEX 148.

On March 12, 2009, the DCP issued Irving a check for benefits for the period from August 14, 2001 to December 1, 2003.  Less than one month later, on April 3, 2009, Irving requested an evidentiary hearing on the grounds that the DCP failed to issue an Eligibility Determination.  Evidentiary hearings were held on July 22, 2009, January 13, 2010, and March 15, 2010. PEX 241 at 1.

Thus, as to Irving's September 25, 2001 request for reconsideration, that request was withdrawn on December 8, 2003.  As to Irving's April 3, 2009 request for an evidentiary hearing, that request was granted and the first of three hearings held less than four months later.

Without additional specification or proof, it is impossible to ascertain the delay about which Irving is complaining or can justifiably complain.  She withdrew her request for reconsideration in 2003 and hearings were promptly held in 2009 and 2010.  If she is complaining about the time between the December 1, 2003 decision and the sending of a check in 2009, all she has shown is delay in the processing of one check.  That surely does not make out a municipal policy or deliberate indifference to a prevalent custom or practice.

      f.      <u>James Winstead</u>

According to Winstead, he suffered an unreasonable delay of approximately 3 years, citing the time between his September 3, 2003 request for reconsideration and ORM's August 2, 2006 final decision. [#156] at 41.

Winstead was injured on four occasions:  1) July 12, 1990, 2) September 14, 1991, 3) September 19, 1992, and 4) January 12, 1994. PEX 87.  On July 10, 2003, the DCP issued a decision regarding Winstead's request for disability compensation relating to all four injuries. PEX 96 at 2.  In that decision, Winstead was informed that he had thirty days within which to file for reconsideration.  His request for reconsideration, however, was received on September 12, 2003, and was therefore denied as untimely by the DCP. PEX 104 at 1.  The document that informed Winstead that his request for reconsideration was untimely, the DCP's <u>Final Decision on Reconsideration</u>, wasn't issued until August 2, 2006, almost three years later.  Winstead knew or should have known that his request was untimely because he received the DCP's July 10, 2003 decision, which stated that he had only thirty days within which to file for reconsideration. He was not, therefore, denied any constitutionally guaranteed due process rights whatsoever in the manner in which his claim was adjudicated.

       g.    <u>Louis Beale</u>

According to Beale, he suffered an unreasonable delay of approximately 4 years and 3 months, citing the time between his February 13, 2002, request for reconsideration and ORM's May 24, 2006 final decision.[10] [#156] at 40.

From this record, the Court cannot conclude that Beale's due process rights were violated.  First, as noted in the accompanying <u>Findings of Fact</u>, during the five month period between February 13, 2002 and July 16, 2002, Beale communicated frequently and regularly with the DCP regarding the status of his claim.  On July 16, 2002, the DCP issued its

---

[10] Beale was injured on August 13, 2001.

Compensation Denial/Termination Order denying Beale's claim on the grounds that his medical condition was not causally related to his August 13, 2001, injury. PEX 15.  Beale was informed at that time that he had thirty days within which to file for reconsideration. Id.  His request for reconsideration, however, was received on August 21, 2002, and was therefore denied as untimely by the DCP.  PEX 29 at 1.  Although the document that informed Beale that his request for reconsideration was itself not issued until June 2, 2006, almost four years later, Beale knew or should have known that his request for reconsideration was untimely.  He was not, therefore, denied any constitutionally guaranteed due process rights whatsoever in the manner in which his claim was adjudicated.

        h.      Patricia Newby

It is not clear from plaintiffs' findings of fact when Newby claims she suffered an unreasonable delay as she makes no specific claim.  See [#156] at 39-44.  Newby was injured on November 30, 1998 and on April 2, 2001. PEX 48; PEX 43.  On January 23, 2004, Newby requested permanent partial disability compensation benefits relating to her injuries. PEX 48. On June 28, 2004, Newby received a letter from the DCP indicating that she was not eligible for any compensation.  Although there is no evidence in the record regarding a request for a hearing, one must have been made because a hearing was held by OHA on October 30, 2008. PEX 237. Less than four months later, on March 17, 2009, DOES ruled that Newby was entitled to temporary total disability and medical benefits from July 9, 2002 to February 28, 2004. PEX 237.  From this record, there is no evidence from which the Court can conclude that Newby's constitutional rights were violated.

        i.      Sheila Owens

According to Owens, she suffered an unreasonable delay of 2 years, citing the time between her April 9, 2004 request for reconsideration and ORM's April 19, 2006 final decision. [#156] at 43.

Owens was injured on February 17, 2004. PEX 189 at 1.  On March 8, 2004, the DCP responded to her timely request for reconsideration by sending her a Form 5 <u>Notice of Controversion/Termination Order</u>, in which it indicated that her claim was being controverted due to lack of medical documentation linking Owens' desire for treatment with the February 17, 2004 injury. PEX 192 at 3.  On May 23, 2004, the DCP received medical records from Owens regarding a motor vehicle accident that occurred in 2002, and on April 19, 2006, the DCP concluded that it should have accepted her previous claim regarding her February 17, 2004 injury after the status of her medical care had been verified. PEX 196 at 2.  Without any additional evidence, the Court cannot conclude that the time between the DCP's receipt of Owens' medical records on May 23, 2004 and the issuance of its final decision on April 19, 2006 was unreasonable.

> j.   <u>Mary Waley</u>

According to Waley, she suffered an unreasonable delay of approximately 3 years and 2 months, citing the time between her January 7, 2004 request for reconsideration and ORM's April 23, 2007 final decision. [#156] at 40.

Waley was injured on August 5, 1994. PEX 30.  On December 17, 2003, Waley received a Form 5 from the DCP reducing her disability benefits. PEX 32.  On January 7, 2004, Waley filed a timely request for reconsideration of the DCP's December 17, 2003 determination and a hearing. PEX 33.  On April 23, 2007, ORM issued its final decision. PEX 233 at 2.

I cannot find that the delay encountered was in itself unreasonable and Waley offers no proof whatsoever that it was the product of a municipal policy or custom or of the District's deliberate indifference to a prevalent practice of unreasonable delays.

k.    Estate of John Lyles

According to Lyles' estate, he suffered an unreasonable delay of 4 years, citing the time between his August 14, 2002 request for reconsideration and ORM's August 2, 2006 final decision. [#156] at 43.

On July 24, 2002, the DCP issued a Form 5 denying his request for a scheduled award for permanency. PEX 176.  Lyles sought formal reconsideration of that request on August 14, 2002. PEX 177.  On December 12, 2002, Lyles requested a formal hearing from OHA. PEX 178.  On July 18, 2003, Lyles sent OHA an application for a formal hearing. PEX 180.  On July 31, 2003, OHA informed Lyles that it lacked jurisdiction over his claim because the DCP had not yet issued its final order. PEX 181.  That process repeated itself when Lyles again requested a formal hearing on August 4, 2003 and OHA again informed Lyles that it lacked jurisdiction over his claim on August 26, 2003.  On September 3, 2003, Lyles sent DOES another application for review, which was received on September 10, 2003. PEX 184; PEX 185.  On February 9, 2004, Lyles again sent ORM a request for a final decision. PEX 186.  DCP's final decision was issued on August 2, 2006.  I cannot conclude that the delay encountered was unreasonable.

l.    Estate of Reginald Rasheed

At trial, we learned that Rasheed died intestate but was survived by his mother and two daughters.  We also learned that his mother, who purported to represent his estate, had never been appointed his representative by the Superior Court.  On September 30, 2010, I ordered plaintiffs' counsel to "file forthwith a suggestion of the death of Reginald Rasheed and then file,

within 90 days thereafter, a motion to substitute the proper party." Order [#151] at 1.  The

"proper party" is, of course, the representative of his estate as appointed by the Superior Court.

See F. R. Civ. P. 17(a).

Thereafter, plaintiffs' counsel filed a motion "to substitute the proper party, Tiara

Rasheed, for Plaintiff, Reginald Rasheed." Plaintiffs' Motion to Substitute for Deceased Party

[#207].  There is no indication however that Tiara was appointed the representative of her

father's estate.  Thus, plaintiffs' counsel has had more than a year within which to petition the

Superior Court to appoint a representative but apparently has not done so.  There is therefore no

one to prosecute this action who has authority to represent Rasheed's estate.  Rasheed's case is

therefore dismissed and judgment will be entered for the defendants on his claim.

 m. Ruby Davis

As noted in the accompanying Finding of Facts, Davis' claims against the District were

dismissed at trial.

 2. Summary Conclusion as to § 1983 claim

Of the thirteen plaintiffs, six have no claim for relief whatsoever.  Of the remaining

seven, one encountered a delay of eight years and one a delay of seven, while the others

encountered a delays of 2, 3, or 4 years.  Finally, one encountered a delay in the processing of a

single check.  I cannot possibly conclude from this evidence that the delays were in themselves

unreasonable and unjustified as to constitute a violation of the due process clause and that the

District was or should have been aware of these violations of the plaintiffs' constitutional rights

because they were so prevalent and obvious.

B. Plaintiffs' § 1985 Claim

In my opinion of March 12, 2008, I indicated why plaintiffs' claim under 42 U.S.C. § 1985 failed.  Although I later vacated that opinion, I now reach the same conclusion I did then: that plaintiffs' claim under this statute fails to state a claim upon which relief can be granted because it fails to allege facts showing any agreement among the defendants (or the defendants and some unnamed third party). Memorandum Opinion [#65] at 4-5.  I persist in that view and add that plaintiffs failed to produce anything at trial that either established that such an agreement existed or established the basis from which such an agreement could be inferred. Thus, judgment will be entered in defendants' favor as to this count.

C.      Plaintiffs' Breach of Contract Claim

There is no proof whatsoever of any contract between plaintiffs and the District of Columbia upon which plaintiffs rely or could rely.  This claim fails for utter lack of proof.

D.      Plaintiffs' Emotional Distress Claim

Judge Walton recently described the requirements that must be met for a plaintiff to succeed on a claim of intentional infliction of emotional distress as follows:

> Under District of Columbia law, a claim of intentional infliction of emotional distress requires that the plaintiff show "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." . . . As the District of Columbia Circuit has explained, "a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'"

Olaniyi v. District of Columbia, 763 F. Supp. 2d 70, 95 (D.D.C. 2011) (internal citations and quotations omitted).

There was, or course, absolutely no evidence presented by plaintiffs that could possibly meet this demanding standard. This claim also fails for lack of proof.

E.      Damages

This case was bifurcated so that the trial on liability would precede the trial on damages.

See Joint Stipulation Regarding Trial [#133].  Since I have now concluded that the plaintiffs

have failed to establish defendants' liability, there is no reason to hold a trial on damages.  In lieu

thereof, the Clerk will enter judgment for the defendants.


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE